UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STEPHEN C.,

                Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

CASE NO. 2:19-cv-01897-JRC

ORDER ON PLAINTIFF'S
COMPLAINT

This Court has jurisdiction pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and Local Magistrate Judge Rule MJR 13. *See* Dkt. 2. This matter has been fully briefed. *See* Dkts. 11, 18, 19.

Plaintiff applied for Social Security benefits based in part on his mental health impairments. Despite agreeing that plaintiff had bipolar affective, personality, and post-traumatic stress ("PTSD") disorders, an Administrative Law Judge ("ALJ") denied plaintiff's application. In doing so, the ALJ improperly rejected the opinions of two examining doctors in

1   favor of the opinions of doctors who did not examine or treat plaintiff and rejected plaintiff's

2   own description of the extent of his symptoms without giving an adequate reason.

3        Thus, this matter is reversed.  Because crediting the inappropriately rejected opinions and

4   testimony as true, plaintiff's application should have been granted, the matter is remanded for

5   calculation and award of benefits.

6   **BACKGROUND**

7        In August 2016, plaintiff filed an application for supplemental security income under

8   Title XVI, 42 U.S.C. § 1382(a), and disability insurance benefits under Title II, 42 U.S.C. § 423,

9   of the Social Security Act.  AR 15.  Plaintiff alleged disability beginning August 2, 2015, when

10  he was 44 years old, on the basis of bipolar/borderline personality disorder, chronic pain,

11  depression, and PTSD.  AR 89–90, 252.  Plaintiff alleged that he stopped working on August 2,

12  2015, due to his conditions and for other reasons.  AR 252.  Plaintiff had most recently worked

13  as an analytical methods supervisor for a pharmaceutical manufacturer (AR 254), and his highest

14  level of education was completing at least four years of college.  AR 253.

15       Defendant denied plaintiff's applications initially and upon reconsideration, and the

16  matter proceeded to a hearing before ALJ Eric Basse.  AR 15.  The ALJ found that plaintiff had

17  at least the severe impairments of osteoarthritis of the right hand, bipolar affective disorder,

18  PTSD, and personality disorder.  AR 18.  Nevertheless, the ALJ found that plaintiff was not

19  disabled.  AR 27.  The Appeals Council denied plaintiff's request for review (AR 1), and

20  plaintiff brought suit in this Court.

21  ///

22  ///

23  ///

24

1

**DISCUSSION**

2

**I.  Standard of Review**

3

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of

4

social security benefits if the ALJ's findings are based on legal error or not supported by

5

substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th

6

Cir. 2005) (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)).

7

**II.  Medical Opinion Evidence**

8

Plaintiff asserts that the ALJ erred in rejecting statements from examining psychologists

9

David Widlan, Ph.D., and Geordie Knapp, Psy.D.  *See* Dkt. 11, at 12–15.  The Court agrees.

10

**A.  Dr. Widlan**

11

In July 2016, Dr. Widlan examined plaintiff, including conducting a mental status

12

examination, and diagnosed plaintiff with generalized anxiety and depressive disorders.  *See* AR

13

366, 370, 372.  The ALJ accepted Dr. Widlan's opinions that plaintiff had mostly moderate

14

limitations and no or mild limitations in some areas.  AR 24.  However, the ALJ rejected Dr.

15

Widlan's opinions that plaintiff had "marked deficits" in adapting to changes in a routine work

16

setting, communicating and performing effectively in a work setting, and completing a normal

17

workday/week.  *See* AR 24.

18

Reviewing doctors who did not examine or treat plaintiff opined that plaintiff had no or

19

moderate limitations in these areas.  *See* AR 126, 139.  Because other medical source opinions

20

contradicted Dr. Widlan's opinions regarding "marked deficits," the ALJ had to provide specific

21

22

23

24

1   and legitimate reasons supported by substantial evidence[1] to reject Dr. Widlan's opinions in this

2   regard.  *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014.)

3           Here, the ALJ provided two reasons for rejecting Dr. Widlan's opinion about marked

4   limitations:  first, that such limitations were inconsistent with plaintiff's ability to engage in

5   activities of daily living; and second, that such limitations were inconsistent with the mental

6   status examination that Dr. Widlan conducted.  *See* AR 24.

7           Regarding the first reason, the ALJ concluded that having marked difficulties in the areas

8   noted by Dr. Widlan was inconsistent with the record because plaintiff attended community

9   college for several quarters and obtained a high GPA, worked a part-time job, and to

10  "maintain[ed] regular engagement in activities he enjoys such as working out."  AR 24.

11          The Ninth Circuit has cautioned against extrapolating from a plaintiff's limited ability to

12  conduct activities of daily living that plaintiff can engage in full-time work:

13          . . . impairments that would unquestionably preclude work and all the pressures of
            a workplace environment will often be consistent with doing more than merely
14          resting in bed all day.  *See, e.g.*, [*Smolen v. Chater*, 80 F.3d 1273, 1287 n.7 (9th
            Cir. 1996)] ("The Social Security Act does not require that claimants be utterly
15          incapacitated to be eligible for benefits, and many home activities may not be easily
            transferable to a work environment where it might be impossible to rest periodically
16          or take medication." (citation omitted))[.]

    *Garrison*, 759 F.3d at 1016.
17
            Here, plaintiff's description of his college and work attendance does not reveal skills
18
    easily transferable to a work environment, as discussed in *Garrison*.  For instance, although
19
    plaintiff testified that he had attended community college, he explained that this was possible
20

21
    _____

22          [1] The Administration has amended regulations for evaluating medical evidence, but the
    amended regulations apply only to claims filed on or after March 27, 2017 and therefore are not
23  relevant to this case.  *See* 20 C.F.R. §§ 404.1527, 416.927 (applicable to claims filed before
    March 27, 2017); 20 C.F.R. §§ 404.1520c, 416.920c (applicable to claims filed after March 27,
24  2017).

because he took "as many online courses" as he could "to limit the amount of time" he was on campus to a few hours per week.  AR at 46–47.  Although plaintiff had a good GPA, overall, he testified that he had to withdraw because he was unable to finish.  AR 49.  Contrary to the ALJ's conclusion, plaintiff's ability to attend college—mostly remotely—for a limited period of time does not indicate that plaintiff was capable of a greater ability to function in a full-time workplace.  The ALJ's reasoning in this regard is unsupported by substantial evidence.

Similarly, regarding his part-time job, plaintiff testified that he had been working "five to ten hours, probably tops, a week" for approximately two months before his hearing.  AR 38. Plaintiff specifically testified that he had issues working with the public at a previous part-time job and that at his current part-time job, he worked "away from the public" and did not have to "talk to anybody else."  AR 40, 45.  Plaintiff explained that despite the limited hours he worked, he continued to have problems.  AR 42.  Plaintiff only had to work when he wanted to and testified that if he worked more, he started to get "wrap[ped] up in my own head and have some issues dealing with people."  AR 42.

In context, plaintiff's testimony about part-time work is not inconsistent with any of Dr. Widlan's limitations because plaintiff explained that he was only able to work extremely limited hours and because he was able to choose when he worked.  As described, plaintiff's part-time work is consistent with Dr. Widlan's limitations in areas related to adapting to change and communicating and performing effectively in a full-time work setting.

Finally, the ALJ concluded that plaintiff's ability to work out was inconsistent with Dr. Widlan's marked limitations.  *See* AR 24.  Again, substantial evidence does not support the ALJ's conclusion.  Although plaintiff testified that he went to the gym with his girlfriend early in the mornings, he did not testify about how long or how often he did so.  *See* AR 50.  This limited

testimony does not support the inference that plaintiff had abilities easily transferable to full-time work.

The second reason that the ALJ gave to reject Dr. Widlan's opinions was purported inconsistency with Dr. Widlan's mental status examination findings. *See* AR 24. But Dr. Widlan found that plaintiff had tested within the "severe" range for depression, that his affect was labile, that he was paranoid, and that he lacked normal insight and judgment. AR 372–73. The ALJ did not discuss these abnormal findings in his decision other than concluding that plaintiff's lability was "normal" (AR 24), instead focusing on the unexceptional portions of the mental status examination.

It is error for an ALJ to substitute his own lay medical opinion for that of a doctor. *See Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999). This error is particularly egregious in the context of a mental status examination, which clinicians use to organize, complete, and communicate their observations about behavioral subtleties such as "the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation." *See* Paula T. Trzepacz and Robert W. Baker, *The Psychiatric Mental Status Examination* 3 (Oxford University Press 1993). Yet here, the ALJ substituted his own interpretation of the mental status examination results for Dr. Widlan's and disregarded without explanation Dr. Widlan's findings that plaintiff had a labile affect, indicated severe depression based on clinical testing results, was paranoid, and lacked normal insight and judgment. See AR 24.

A review of Dr. Widlan's clinical findings shows the significance of the ALJ's error. Dr. Widlan noted that plaintiff was paranoid, that he presented as labile (corresponding with his report that he lost his temper easily), and that his clinical testing supported the severity of his

depressive symptoms.  *See* AR 369–70.  Thus, by ignoring the atypical findings in the mental status examination, the ALJ overlooked the very clinical findings that formed the basis for Dr. Widlan's opinions.  Moreover, Dr. Widlan also appears to have based his opinions on plaintiff's self-report of mood acceleration, acute flight or fight responses, easily becoming overwhelmed, and near daily panic attacks.  *See* AR 369.  Yet, the ALJ made no mention of these other aspects of Dr. Widlan's findings that supported his opinions.

In short, the ALJ failed to provide any specific and legitimate reason supported by substantial evidence to reject Dr. Widlan's opinion regarding marked limitations.

### B.  Dr. Knapp

In May 2018, Dr. Knapp examined plaintiff, including conducting a mental status examination and reviewing Dr. Widlan's report.  *See* AR 488, 492.  Dr. Knapp diagnosed bipolar disorder and PTSD.  AR 489.

The ALJ accepted most of Dr. Knapp's opinions but rejected Dr. Knapp's conclusions that plaintiff suffered from marked difficulties maintaining appropriate behavior and setting realistic goals and that plaintiff suffered from severe difficulties performing activities within a schedule, maintain regular attendance, communicating and performing effectively in a work setting, and completing a normal workday/week.  AR 24.  Dr. Knapp's opinions in this regard were contrary to those of the reviewing doctors, who, as noted, concluded that plaintiff had at most moderate mental limitations.  *See* AR 126, 139.  Thus, the ALJ had to provide specific and legitimate reasons supported by substantial evidence to reject Dr. Knapp's limitations.  *Garrison*, 759 F.3d at 1012.

The first reason that the ALJ gave to reject Dr. Knapp's opinions was that plaintiff's abilities to "obtain a high GPA after several quarters in community college, maintain part-time

1    work, [and] maintain otherwise normal daily hobbies and activities" were inconsistent with Dr.

2    Knapp's marked to severe limitations.  AR 24.  As noted above, however, plaintiff's testimony

3    about his limited success holding a part-time job, attending college, and working out at the gym

4    does not evince the abilities necessary to hold a full-time job.  The ALJ erred in relying on this

5    rationale related to Dr. Knapp's opinion.

6         The ALJ also erred by again highlighting positive findings ("Dr. Knapp's description of

7    [plaintiff] as alert, logical, progressive, and cooperative" (AR 24)) and failing to give any

8    explanation for rejecting the findings that supported Dr. Knapp's opinions.  Based on his

9    interview with plaintiff, Dr. Knapp found that "[t]he horror of [plaintiff's] work [in a chemical

10   weapons program] in combination with childhood abuse and trauma result in ongoing nightmares

11   and flashbacks.  Panic attacks and being over-reactive resulted in his being fired from three jobs

12   in five years. . . ."  AR 488.  And, documenting the mental status examination, Dr. Knapp wrote

13   that plaintiff's speech was "rapid, loud and well above average word production" and his

14   presentation was "generally logical and progressive" but at times "tangential."  AR 491.  Plaintiff

15   was "agitated and angry," his mood was "angry and depressed," and his affect was "fairly flat."

16   AR 491.  There was evidence of impaired concentration, and Dr. Knapp noted that plaintiff's

17   psychosocial history indicated "impaired social judgment and poor insight."  AR 493.

18        Despite these many negative findings, the ALJ reduced Dr. Knapp's observations to

19   "alert, logical, progressive, and cooperative" and gave little weight to Dr. Knapp's most

20   significant opinions on this basis.  Substantial evidence does not support the ALJ's reasoning.

21        Finding error in the evaluation of Dr. Knapp's and Dr. Widlan's opinions, the Court does

22   not address the remainder of plaintiff's arguments about the medical opinion evidence.  The

23   Court turns to the ALJ's evaluation of plaintiff's subjective symptom testimony.

24

### III. Plaintiff's Testimony

The ALJ summarized plaintiff's testimony at the hearing as follows:

> [Plaintiff] alleged disability due to poor memory, anxiety, pain, rage, and anger [citation omitted]. [Plaintiff] alleged that he had trouble with day-to-day functioning due to insomnia and mood swings. He testified that he had days when he was unable to leave the apartment due to stress. [Plaintiff] testified that his anxiety manifests as anger. He also alleged constant pain in his right hand. . . .

AR 21. However, the ALJ rejected plaintiff's testimony about the nature and extent of his symptoms. To do so, absent affirmative evidence of malingering, the ALJ had to provide "clear and convincing" reasons supported by substantial evidence. *Morgan v. Cmm'r*, 169 F.3d 595, 599 (9th Cir. 1999); *see Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008)

Plaintiff challenges solely the evaluation of his statements about mental limitations. Therefore, the Court does not address the reasons that the ALJ gave specifically to reject plaintiff's testimony about hand pain.

Regarding plaintiff's mental symptom testimony, the ALJ first concluded that plaintiff had not sought treatment until 2016, which undermined the credibility of plaintiff's statements, according to the ALJ. *See* AR 22. This reasoning was improper. Plaintiff sought treatment throughout the relevant period, and his failure to do so earlier in that period is not a convincing reason to discredit his testimony. "'[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)).

Second, the ALJ focused on several instances in 2016 when plaintiff's providers noted that his psychiatric condition was "normal" on evaluation. *See* AR 22. But in four evaluations of plaintiff's mental status in the latter half of 2016, providers conducting mental status

1    examinations documented that plaintiff had abnormal motor behavior, tearfulness, anxious

2    mood, possible paranoia, accelerated body movements, pressured speech, delusions,

3    circumstantial and tangential thought process, loosened associations, and poor insight, judgment,

4    and impulse control.  AR 342–43, 353, 358, 361.  As noted above, Dr. Widlan also found during

5    this period that plaintiff was severely depressed, paranoid, and lacked insight and judgment.  AR

6    373.  The ALJ provided no reason for choosing to focus on two "normal" evaluations during

7    2016 and ignoring at least five atypical evaluations from the same year in his discussion of

8    plaintiff's symptom testimony about mental limitations.

9         Defendant relies on the ALJ's discretion to interpret ambiguous records as grounds to

10   affirm this matter.  *See* Dkt. 18, at 4.  But where the ALJ ignores significant, probative evidence

11   and chooses to selectively focus only on those aspects of the record that support the ALJ's

12   ultimate conclusions, the ALJ errs.  *See Reddick v. Chater*, 157 F.3d 715, 723 (9th Cir. 1998)

13   (rejecting the ALJ's findings where "[h]is paraphrasing of record material is not entirely accurate

14   regarding the content or tone of the record.").

15        The ALJ also made much of his finding that plaintiff's difficulties were caused by

16   reactions to situational stressors, such as plaintiff's recent divorce, losing his job and car, and

17   having many debts.  *See* AR 22.  However, the ALJ's rationale is unconvincing.  The premise of

18   plaintiff's application for benefits is that many of what the ALJ considered "situational stressors"

19   were in fact circumstances caused by his mental limitations—which prevented him from

20   maintaining full-time employment.  *See, e.g.*, AR 43 (plaintiff's testimony that working more

21   than limited hours triggers mental symptoms), 252 ("Why did you stop working?  Because of my

22   condition(s). . . ."  (Emphasis removed.)).  It makes little sense to reject plaintiff's symptom

23   testimony on the basis that he is reacting to losing his job and to financial difficulties when

24

1    plaintiff is arguing that his conditions caused those circumstances.  *See* AR 43, 252.  The Court

2    notes that despite concluding that plaintiff's recent divorce was a "situational stressor," the ALJ

3    made no inquiry into whether plaintiff's mental problems factored into his marital difficulties.

4           Further, part of plaintiff's alleged disability—and routinely documented throughout the

5    record—is that he lacks the ability to react appropriately to stressful life events.  For instance,

6    plaintiff told one provider that "any stress at all" caused plaintiff to panic "like I'm gonna die."

7    AR 352.  Plaintiff's documented inability to react appropriately to stressful life events is not a

8    convincing reason to discount his allegations of disability.

9           The ALJ also concluded that plaintiff's symptom testimony lacked credibility because of

10   conflicting diagnoses in plaintiff's medical records for his mental conditions.  *See* AR 22–23.

11   But the ALJ failed to explain how this was contrary to any particular testimony that plaintiff

12   gave.  Without further explanation, this was not a clear and convincing reason to reject plaintiff's

13   testimony, either.

14          The ALJ additionally appeared to conclude that plaintiff's statements about his mental

15   limitations were inconsistent with the record because plaintiff was "mentally stable" despite

16   "sporadic and inconsistent" use of medication.  AR 21.  Evidence that "conservative treatment"

17   adequately controls symptoms may be sufficient to discount a plaintiff's testimony regarding

18   severity of an impairment.  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995); *see also* SSR

19   16-3P (Oct. 25, 2017) ("If the frequency or extent of the treatment sought by an individual is not

20   comparable with the degree of the individual's subjective complaints, or if the individual fails to

21   follow prescribed treatment that might improve symptoms, we may find the alleged intensity and

22   persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

23   Nonetheless, before holding failure to seek more aggressive treatment or to comply with

24

1   prescribed treatment against a plaintiff, SSR 16-3p directs that an ALJ must "consider[] possible
2   reasons [plaintiff] may not comply with treatment or seek treatment consistent with the degree of
3   his or her complaints."

4           Here, the ALJ somewhat confusingly concluded both that plaintiff's medications
5   controlled his symptoms and that plaintiff's symptoms were stable without medications.  *See* AR
6   23.  The record contradicts the findings that the ALJ made in support of each of these
7   conclusions.  For instance, although the ALJ held plaintiff's failure to immediately pick up his
8   medication against him, the ALJ's own findings explain that plaintiff did so because of insurance
9   issues.  *See* AR 23.  Contrary to the ALJ's conclusion that plaintiff did not deteriorate in the
10  meantime, plaintiff stated that he was struggling and had "punched himself a couple of times."
11  AR 386.

12          The ALJ also concluded that medications were controlling plaintiff's symptoms by early
13  2017.  *See* AR 23.  But, during this time, plaintiff specifically stated that he could no longer
14  tolerate the side-effects from his prescriptions (requiring adjustment to his prescriptions) and that
15  his depression had not improved and that he was paranoid and worried he would "snap."  AR
16  395.  Although the ALJ focused on a subsequent notation that plaintiff "seemed more relaxed"
17  after a medication change, the ALJ ignored that within the same note, the provider documented
18  that plaintiff continued to suffer from depression and anger.  AR 396–98.  Shortly afterward,
19  plaintiff expressed uncertainty that his adjusted medication was helping and stated that he was
20  angry and "ha[d] thoughts of drow[n]ing himself. . . ."  AR 401.  By May 2017, plaintiff's
21  prescriptions were again adjusted due to side effects.  AR 405.  Thus, the records that the ALJ
22  cite contradict the ALJ's conclusions that medications effectively controlled plaintiff's
23  symptoms.

24

1      The ALJ also found that plaintiff's symptoms were stable after ceasing medication in

2   mid-2017.  *See* AR 23.  But the records that the ALJ relied upon contradict the ALJ's

3   conclusions that plaintiff was "stable" at this time.  *See* AR 413.  In August, plaintiff's provider

4   documented that he seemed anxious and spoke "at length and with considerable energy."  AR

5   416.  And in a record that the ALJ cited from August 10, 2017, plaintiff stated that he felt the

6   same after stopping medications, yet continued to have depression, anxiety, anger, and

7   intermittent suicidal thoughts.  AR 417.

8       The ALJ largely glossed over records documenting that plaintiff resumed taking

9   medication yet continued to have symptom complaints throughout 2017 and 2018.  *See* AR 23.

10  Of note, in an appointment in 2018, plaintiff's provider noted that he was "in distress," appeared

11  reactive, had impulsive suicidal thoughts, and presented consistent with PTSD and borderline

12  personality disorder.  AR 482, 484.  As plaintiff points out, the ALJ's depiction of the record was

13  based on an incomplete discussion of the evidence that implied that plaintiff had stopped taking

14  all medications in July 2017 and suffered no significant symptoms afterward.

15      The ALJ also appears to have found that overall, plaintiff was not credible because he

16  gave varying accounts of his interest in finding employment and because plaintiff engaged in

17  "heavy drug use while he was working."  AR 23.  Regarding plaintiff's desire for employment,

18  however, there is no inconsistency in the cited records.   In one record, plaintiff stated that he

19  wanted to get well before he focused on maintaining employment.  AR 340.  In another record,

20  plaintiff's provider noted that plaintiff had "ambivalence about working and being independent"

21  and wanted to stop working at his part-time job.  AR 425.  Neither of these records are

22  inconsistent with plaintiff's stated belief that he could not work until his mental health improved.

23  Nor do they suggest that plaintiff was exaggerating his symptoms to receive benefits.

24

1      As for plaintiff's statement about drug use, plaintiff claimed that despite his heavy drug

2  use in the past, he was able to successfully hold a job.  *See* AR 395.  But the ALJ did not explain

3  how plaintiff's past drug use was relevant to his ability to maintain employment during the

4  relevant period.  Instead, the ALJ appears to have inappropriately decided that because plaintiff

5  had abused substances before the relevant period, he was not credible.  *See* SSR 16-3p

6  ("[A]djudicators will not assess an individual's overall character or truthfulness in the manner

7  typically used during an adversarial court litigation. The focus of the evaluation of the

8  individual's symptoms should not be to determine whether he or she is a truthful person.").

9      Defendant relatedly asserts that the ALJ's brief finding that plaintiff had given conflicting

10  information about his alcohol usage justifies the ALJ's rejection of plaintiff's symptom

11  testimony.  *See* Dkt. 18, at 4.  However, the ALJ did not link this finding to a wholesale rejection

12  of plaintiff's testimony.  Even if the ALJ had done so, as noted above, such would not justify

13  finding that plaintiff's testimony was overall unreliable.  *See* SSR 16-3p.

14      Finally, the ALJ briefly stated that plaintiff's ability to attend college, maintain "his

15  hobbies," go the gym and park regularly, and work part-time were contrary to his claimed

16  limitations.  AR 23.  As noted above, much of this rationale is suspect.  The ALJ did not provide

17  any explanation in his discussion of plaintiff's testimony of why "going to the park" and

18  maintaining unlisted "hobbies" would be inconsistent with plaintiff's claimed limitations.

19      The Court notes that plaintiff's primary mental symptom complaints, as summarized by

20  the ALJ, pertained to mood swings and anxiety that manifested as rage.  *See* AR 21.  Plaintiff's

21  ability to minimally function in environments where he was able to avoid most social contact and

22  on a flexible schedule does not suggest that his anxiety, anger, and emotional lability were less

23

24

1    than he testified.  Thus, the ALJ failed to provide clear and convincing reasons in this aspect of

2    his decision, as well.

3           In short, the ALJ gave no clear and convincing reason supported by substantial evidence

4    to reject plaintiff's subjective symptom testimony about his mental health symptoms.

5           **IV.  Not Harmless Error and Remand for an Award of Benefits**

6           Errors in social security cases are harmless if they are inconsequential to the ultimate

7    nondisability determination.  *See Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015).  Here,

8    however, had the ALJ not improperly rejected the doctors' opinions and plaintiff's testimony, the

9    outcome could well have differed.  Notably, the ALJ did not include limitations related to

10   attendance or persistence limitations in the RFC, despite that the examining doctors believed

11   plaintiff had significant limitations in these areas.  *See* AR 20–21.

12          Plaintiff requests remand for an award of benefits.  Dkt. 11, at 18.  Defendant argues that

13   there are factual issues raised by plaintiff's ability to work part-time and attend college.  *See* Dkt.

14   18, at 15.

15          A remand for further proceedings, rather than an award of benefits, is appropriate.

16   Generally, "where '(1) the record has been fully developed and further administrative

17   proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient

18   reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the

19   improperly discredited evidence were credited as true, the ALJ would be required to find the

20   claimant disabled on remand,'" a remand for an award of benefits is appropriate.  *Trevizo v.*

21   *Berryhill*, 871 F.3d 664, 682–83 (9th Cir. 2017) (quoting *Garrison*, 759 F.3d at 1021).  But

22   "[w]here there is conflicting evidence, and not all essential factual issues have been resolved, a

23

24

1  remand for an award of benefits is inappropriate." *See Treichler v. Cmm'r*, 775 F.3d 1090, 1101

2  (9th Cir. 2014).

3         Here, the conditions that the Ninth Circuit requires to justify a remand for an award of

4  benefits have been satisfied.  The record has been fully developed, and a remand would serve

5  only to allow defendant a second chance to justify denying benefits, rather than an opportunity to

6  develop any material ambiguities in the record.  *See Garrison*, 759 F.3d at 1021 ("our precedent

7  and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose

8  of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the

9  first part of credit-as-true analysis.").  Regarding the opinion evidence about plaintiff's mental

10  health, the Court notes that the ALJ rejected the opinion of both doctors who examined plaintiff

11  (giving improper reasons in doing so) in favor of the opinions of doctors who only reviewed

12  plaintiff's records.  This was contrary to defendant's own directions for pre-2017 applications.

13  *See* 20 C.F.R. § 404.1527(c)(1).

14         The Court further disagrees with defendant's portrayal of plaintiff's work history and

15  college attendance as ambiguities requiring remand.  As the Court discussed above, and as

16  plaintiff explained at length at his hearing, plaintiff was ultimately unable to finish his college

17  program and had limited success working and attending classes only because he was able to

18  structure his participation in those activities to accommodate his limitations.  There is no

19  material ambiguity.

20         Finally, the Court notes that if Dr. Knapp's improperly rejected opinion were credited as

21  true and incorporated into the RFC, the hypothetical to the vocational expert would have

22  included that plaintiff was "unable to" maintain regular attendance in the workplace and to

23  communicate and perform effectively.  *See* AR 489–90.  The hypothetical would also have to

24

incorporate plaintiff's testimony that he could not attend work at least once or twice a week due to his insomnia. *See* AR 67–68. Based on the vocational expert's testimony at the hearing, someone who could not maintain attendance and had more than two days monthly of unscheduled absences would be unemployable. AR 80. Similarly, someone who had even a 20% drop in productivity based on being off-task at least 20% of the day would be unable to maintain full-time work. AR 83–84. Thus, it is clear that crediting plaintiff's testimony and Dr. Knapp's opinion as true, plaintiff is entitled to an award of benefits.

### CONCLUSION

Based on these reasons and the relevant record, the Court **ORDERS** that this matter be **REVERSED AND REMANDED** for calculation and an award of benefits pursuant to sentence four of 42 U.S.C. § 405(g). **JUDGMENT** should be for the plaintiff, and the case should be closed.

Dated this 25th day of September, 2020.

J. Richard Creatura
United States Magistrate Judge